Good morning. May it please the Court, Bob Van Ness for Appellant Qualcomm. I'd like to reserve three minutes of my time for rebuttal if the Court will allow it. There are three major flaws in the District Court's order, any one of which requires reversal. First, plaintiffs claim that alleged royalty surcharges paid to Qualcomm by cell phone manufacturers were passed through all channels of distribution to them in the form of higher prices or reduced quality. But they failed to show that impact to all or nearly all 250 million class members could be established through common proof, because the econometric model they advance cannot account for the tens of millions of consumers who purchase phones at a focal point price or at a price subsidized to zero. In either case, their model fails to show pass through to consumers. In addition, millions more class members who purchased Apple phones after 2016 were also not injured because Apple was paying no royalties whatsoever to Qualcomm and therefore there was nothing to pass through. To the extent the plaintiffs are relying on changes in quality to establish injury, there's no evidence in the record that could prove that every OEM increased, would have increased quality in a but-for world over the millions and millions of phones sold in this eight-year period and their model makes no attempt whatsoever to show that that would have happened. Second, the district court certified the largest and most diverse class in history without having considered how such a class will be managed. 250 million members of the class, 1.2 billion separate transactions are implicated by this model, manufactured by more than a dozen phone makers, sold through thousands of points of distribution by carriers, retailers, and manufacturers, each of whom makes independent pricing decisions. The district court failed to provide any practical means for Qualcomm to challenge whatever evidence of pass through plaintiffs presented for these channels, sellers, cell phone models, and pricing plans that are implicated by the order. And third, the district court contravened MAZA when it applied California law to a nationwide class, completely disregarding the demonstrated interests of non-repealer states like Texas, Ohio, and the other amici here, in the application of their law to activity in their states. Instead, the district court chose to federalize California policy and impose it on all other states. My colleague... Counsel, I won't speak for my colleagues, but I would be most interested in having you start with point number three. Certainly, Your Honor. And my colleague from the Department of Justice will address that as well. MAZA, here, the district court's treatment of it represents a clear error of practice, that California law cannot be applied to plaintiffs who were harmed in other states when doing so conflicts with policy choices those states have made. Plaintiff's theory, accepted by the district court, is that MAZA simply doesn't apply when the defendant is a California company operating in California. But that theory contradicts MAZA itself. Since the defendant there was also a California company, headquartered and doing business here in California, this class consists of tens of millions of members who purchase their phones in states which do not permit indirect purchase or actions like this one. And for a variety of reasons, those states have drawn a different balance between consumer protection and fostering an attractive business environment. MAZA says... How would those states be impacted by a settlement here? Or by a full trial and judgment? The Department of Justice and the AMICI are making the point that those states made different policy choices with respect to business done in those states. They want a different balance between consumer protection and attractive business environment, including choice for consumers. They've made a decision that in those states they don't want folks doing business there to have to face excessive litigation or face additional liability or face duplicative recovery. And so they have said we are a non-repealer state. You do not have a cause of action. Isn't it even more fundamental than that though that you can't certify a class where you have, if you have all these different, and I guess the question is whether California law can supersede these other state laws. But isn't that the real problem here is that you have class action impracticable? That's right, your honor. That's right, your honor. And the district court avoided that by simply declaring that she didn't have to pay any attention to the decisions of other states because the defendant was here in California. So if we were to agree with you, if we were to agree with you on this point, what do we do? Because it seems like this argument does not undermine a statewide class action in California and perhaps even a larger class action that included other states whose law was similar or who had repealed Illinois, sorry. Illinois brick.  That's right, your honor. Is that right? Is that what would happen? If the court agreed that the district court made an error of law in this regard, the court should reverse the order, send it back to the district court for further proceedings consistent with your ruling. And then Judge Koh would have to decide whether in light of the fact that all these other states' laws are implicated, she could certify. That's what would happen. And I think it's very clear here. But is there anything that would prohibit a certificate? Let's just start even on the most basic level. Is there anything that would prohibit certification of a California statewide class? There are many things. There are other issues, but under Mazza, Mazza doesn't address that. Mazza addresses the application of other states. But we have two other key points I'd like to get to. Well, before we get there, can I just make sure I understand? As I understand it, we do have federal claims that go to injunctive relief, and that was also, a nationwide class was certified as to Sherman Act claims, and injunctive relief was granted. Is that right? Injunctive relief was not granted, but a class was certified. Okay, the class was certified as to injunctive relief. As to injunctive relief. And these claims don't apply to that, right? Your arguments right now don't apply to that. My arguments apply to the Cartwright Act and application of California state law to all the states involved, all 50 states. If we agreed with you on these arguments, we would only be looking at damages, remand on damages. Would we affirm, and maybe this is leading you into your new arguments, but would we affirm on a nationwide, can you have a nationwide class as to injunctive relief and then a subclass that addresses different states? You conceivably could. This is not an appropriate case for that, Your Honor. This is really a case about money and about damages, and that's what we're fighting about. Well, is it? I mean, it seems like it's a, I mean, that's a pretty big issue for Qualcomm, whether they can go forward. And part of that question is whether that's mooted out by the FTC. There's a separate nationwide. That's right. There's a separate FTC action, which has been resolved in the district court, has been appealed, and will be argued in this court on February 13th. Do you think that that moots this out? If the Ninth Circuit were to decide that the FTC action was improperly brought or the judgment for Qualcomm, yes, this case would be moot. That's exactly right. But only if the Ninth, it doesn't right now, only if the Ninth Circuit upheld the injunctive relief in the FTC case. Well, if this case is a jury trial, that case was a bench trial. But if the court were to say there was no antitrust violation, obviously, this case would be mooted out. That's going to be argued on February 13th. It would be mooted out even as to the Cartwright Act? I believe so, depending on how broad the court's ruling was, because the FTC proceeded on many of the same theories, not all the same theories, but many of the same theories. Is your position that the two injunctions that are applicable, they're coextensive? There's no difference between the two, between the injunction that plaintiffs are seeking here and what the FTC is seeking? Plaintiffs have been very vague about what they're seeking here by way of injunctive relief. The FTC obviously has an injunction that was awarded by the district courts. It's been stayed by the Ninth Circuit pending the argument. The court's judgment was stayed. The district court's FTC judgment has been stayed while the appeal is pending. But I don't think they're necessarily precisely coextensive. But the plaintiffs here, at this stage, should be. It very well could, depending on what the Ninth Circuit ruled. Okay. But that's a question for a later date. It's a question for a later date. And if the court pleases, I'd like to pass on to predominance, which is really another critical issue in which the district court committed error. The court's order fails to satisfy the standards for certification set forth by the Supreme Court in Comcast and Walmart. Obviously, they had an obligation to show that antitrust impact can be proven through common evidence for all or nearly all members of this class. Comcast and Walmart say that cert's proper only after a rigorous analysis, even if that analysis overlaps with the merits. And in this circuit, that means finding persuasive evidence that liability can be established commonly. Here, the district court failed to conduct such a searching inquiry. And counsel, let me take you back to the FTC action. If we affirmed the FTC action, would that be collateral stop loss to this question about persuasive evidence? No, it would not, Your Honor. Because, again, that's a bench trial. We have a jury trial right in this case. It's a damages case, fundamentally. So no, it wouldn't be collateral estoppel. Could it be introduced as evidence? I don't think so. I think it would be highly prejudicial to have that introduced. Certainly not in a jury trial. It's actually of no effect? Well, it would be of effect legally on Qualcomm if it were affirmed. But in terms of this trial, it should have no effect. That's right. It's a separate case. It's a bench trial, not a jury trial. It would have a legal effect on Qualcomm, but it shouldn't have any effect on the jury trial here, where both parties have demanded a trial by jury. And the court would be obligated to provide that. Now, in our case here, it was conceded by the plaintiffs that there are tens of millions of phones sold at focal point prices. $99, $199, $299. And as to which, their model doesn't show there would have been any change in price. There are millions more sold at zero, subsidized to zero as part of a service plan. And as to those people, obviously, there can be no price pass-through. They didn't pay anything for their phone. So they're falling back. There might be a price pass-through that's going to be disguised someplace else. It's going to be reflected in their monthly charges. That's possible, Your Honor, but they did no modeling of that here. They did no modeling of any service contracts. Their model is limited to looking at the cost to build the phone and the relationship between that and the price, right? They're only modeling the cost to build the phone itself and the price. They're not even modeling the very small alleged surcharges of a few dollars. They're modeling total cost against price. There's no modeling whatsoever of any phone contract and no modeling of any quality issues. That's another key point. The district court accepted as a theory. And at page 46 of her order, which is the excerpts of record 46, she says, the expert posits a theory that even if prices didn't change, quality would have changed. But again, it's only a theory. No evidence was advanced in support of it. Their model, in fact, holds quality characteristics constant. It doesn't test for changes in quality as a function of price, excuse me, of cost. It holds quality characteristics constant and tests only the relationship between total cost to build the phone and the price. So again, the district court accepted as a theory that this could happen. But again, Comcast and Walmart and Ellis all tell us, you can't certify a class based on a theory. There has to be evidence by which. There was no affidavit or no expert testimony about it. There's a statement by the plaintiff's expert that he can determine changes in quality. There's a theory. But even he. Is that an affidavit form or is that just a. It's a declaration. It's a declaration, right. But even he concedes that he held quality constant and tested only cost versus price. And there again, under Comcast and under Walmart and under Ellis, the district court had an obligation to look behind the mere statements of their expert and behind their allegations and look and see what does the model show. Had she done that, she would see the model does nothing to determine whether there could or would have been changes in quality based on changes in cost. So I appreciate your arguments. I think they're really strong. But how is this? How do we review this? Because we're not reviewing a de novo, right? Everything you're arguing, we would have to find that the district court abused its discretion. And I feel like you're re-arguing some of the same arguments that you did below to us. And so I'm trying to figure out what purview we have. I mean, if you're right that there's nothing in there, I suppose you'd argue that that's abuse of discretion. Well, what we're arguing, Your Honor, is that there was an error of law when the court failed to apply the rigorous analysis standard of Comcast and Walmart. And an error of law is always an abuse of discretion. So yes, legally, it's an abuse of discretion standard. But here, where the Supreme Court and the Ninth Circuit have said you must apply a rigorous analysis and find persuasive evidence to support your points, that's where the district court failed. What if we don't agree that it's a legal error and we start delving into the facts? Doesn't that then turn it into a, I mean, it's still abuse of discretion. And under an abuse of discretion standard, Your Honor, the complete absence of any plausible evidence would support reversal. And here, that's crystal clear. For example, when it comes to prices at zero, the court recognized that there could be many instances in which people paid nothing and there's no price pass-through. She simply said, that's for the merits. We'll deal with it later. Comcast doesn't allow that. Ellis doesn't allow that. She took at face value their expert's statement that he had controlled for prices at zero. No, he didn't do that. He didn't control for prices at zero. What he said about that was, well, if they didn't suffer a price pass-through, the quality of the phone would have changed. But again, they presented no evidence that that was particularly so commonly across millions of consumers, dozens of OEMs, an eight-year class period. It's ridiculous. Common sense tells you that if you're talking about changes in cell phone quality, that's not going to be a common issue. There are dozens and dozens of cell phone manufacturers and making independent decisions on what sort of phone they want to make. So in this case, the failure to look behind the representations about quality, behind the representations about subsidies and zero pricing, and a third one, the trial court said it was OK to average. Averaging is not OK in a situation like this. If you average three phones where there's no pass-through and three phones where the pass-through is 130%, of which there are examples in their model, the average pass-through is 65%, even though three of those phones suffered absolutely no impact and therefore no injury and therefore no liability. And the model that he presented uses averaging over and over to mask the millions and millions and millions of class members who suffered no price impact whatsoever and as to whom it can't be shown that they suffered a quality impact. Averaging here, the results of his so-called model hides and masks the millions of people in the class. And when that's true, as in the Asipkal case from the First Circuit or the fuel surcharge case. You're almost down to two minutes now. I know you want to reserve three. I'd like to reserve as much as I can, Your Honor. No, you're down to two. I'll pause now and return subsequently. Thank you. Thank you, Mr. Van Ness. Ms. Wimberly? Good morning, Your Honors. Mary Helen Wimberly for the United States. May it please the Court. As Mr. Van Ness previewed, I'm here to talk about the third question presented here, which is the district court's departure from MAZA. And I'd like to address three topics related to this issue. Namely, the state interest at play, the relevant tests that would apply should the court reach the third step of the governmental interest test, and the extent to which ARC-America applies here. So turning first to the relevant interest at play, the district court found that the states other than California had no interest in applying their laws to this dispute. But that's directly in contradiction to MAZA, which held that each foreign state has an interest in applying its law to transaction within its borders. And if we look at the AT&T mobility case, which was decided on due process grounds, it said for indirect purchaser claims, there are two halves of the relevant conduct. First, there's the anti-competitive conduct by the defendant. And second, there is the indirect purchaser's transaction where it buys the product that has been, for example, price fixed from someone other than the defendant. And what MAZA does is says, in the choice of law context, when you have those two separate transactions, and when those two separate transactions take place in two separate states, what wins is the state where the injury occurred, where the last event necessary for liability is to the foreign class members happened. And that's critical. It's not just where liability in the air exists. It's where. So as I take it, damages is actually a part of the cause of action, is that right? Well, I'd say the injury is part of the cause of action, yes. And certainly when you're making a damages claim, the amount of damages is part of the cause of action. And this strikes me as different than the FTC case where here, how do you even determine where the harm occurred? Because you could have a plan, you could have somebody buying, I'm a California resident, I buy it here in California, maybe I'm hurt in California, we don't know, except for the modeling. And then I send the phone to my mom in Illinois, and she's using the phone, and she may be harmed if the issue is whether the monthly fees increase. So how do we make that determination? Well, I think there's no dispute under the plaintiff's theory here. They're talking about an overcharge. In this case, an overcharge in terms of the quality-based pricing, so. But of the phone or of the monthly fee? I believe of the phone itself. Oh, so we're not even, okay. So you're talking about the transaction where that harm is incurred is the sale, where you buy the phone at either the surcharge or you don't receive the quality you otherwise would have at that price. And even under California law, that's the place where the indirect purchaser would be harmed. So the only harm we're talking about here is the transaction of purchasing the phone. Right, which has been passed through the chain of distribution from direct purchasers. But the harm that the, I mean, that's the nature of the indirect purchaser's claim is they have been harmed in their purchase of the phone. So the harm is where the purchase is made,  Exactly. And so from the other state's perspective, those that have elected not to follow, or those who have elected to follow Illinois BRIC, they're saying, look, we don't want our direct purchasers to get involved in, for example, having to prove even if they're not plaintiffs or defendants in the case, how much they pass through. We don't want defendants who are going to be sending their products into the state to be subject to that litigation. And they're unable to make that choice. And on the flip side, California is not impeded in its ability to deter antitrust violations within the state. It has 12% of the United States population. Would the government, would you object if, as to this point, if we said, yeah, this was improper, there's different states, but you can certify a class action as to all purchases that were made in non-Illinois BRIC states? Or it's even more complicated than that, I guess. It has to be states where the law departs from Illinois BRIC and is the same as California, right? We've taken no position on that, other than to say that we oppose a classification that requires California law's application to an entire nationwide class. And if I just might make two quick final points, I see my time is almost up. The first being that the place of the wrong is still the applicable test, meaning the place of injury under California law. Where it has been deemed obsolete is when that applies without regard to the issue, which is exactly what McCann explained. So in other words, if it's not a disputed issue, not one that's likely to be dispositive, courts are unlikely to apply it reflexively. But it still remains the applicable test under California law. And secondly, ArkAmerica presented the exact opposite circumstance that happened here. In that case, states were suing on behalf of state entities as class actions under their own state laws. So their class was defined by the state. Here, you have California expanding to the entire United States, effectively displacing U.S. federal law. And that's where we have a problem. Thank you, your honors. Thank you, Ms. Wimberly. Mr. Seltzer. The police of the court, Mark Seltzer on behalf of the plaintiffs and the appellees. I'd like, first of all, just to address the choice of law question that was the issue that Judge Bivey said we'd like to take up first. AT&T Mobility establishes without a doubt that California's Cartwright Act can constitutionally be applied and not in violation of the Due Process Clause to every purchaser of goods across the United States and specifically in the non-repealer states. In fact, that's what Judge Ilsen held on remand in that case where she had adopted a place of purchase rule as being the only applicable rule that could be applied constitutionally. The Ninth Circuit said that's not accurate. And the Ninth Circuit did so citing to California law as to why California's Cartwright Act applies. California has a strong interest in deterring misconduct occurring within its borders by persons violating California law within its borders. California's law was cited to that effect. But it's not even California residents that are being injured in some of those situations. That's right. But California has an interest in providing remedies to those as well. Let me explain why. California, the law of California says that the Cartwright Act is designed to deter wrongdoing within its borders and to enforce its laws. It's primarily a law enforcement function and a deterrence function. If persons in other states have no remedy under California law for a violation taking place with inside California's borders, those defendants, companies doing business in California, will be under-deterred because they will not respond. That makes sense from a regulatory and a government perspective. But how does that make sense for a plaintiff who, I mean, to come in and sue? I guess your position is you're stepping into the Attorney General's position in trying to recover this money. Well, in part, a private plaintiff is recognized for many years as operating as a private Attorney General and has a law enforcement function. But this is not a class action issue. Suppose somebody in a non-repeal state, an individual, bought a product that was overcharged as a result of wrongdoing taking place in California, within California's borders by a California company, why would that person be denied the right to invoke the law of California in his favor against that defendant? That's the issue. It's a choice of law issue. But wouldn't the choice of law inquiry be the same if you had an individual from a non-repealer state who came to California and brought suit? Yes, exactly. Would you still have to apply a choice of law provision? Exactly, and that's the point. Why would California choose to apply the Cartwright Act rather than the law where the final act occurred? And the reason why that's so, and this is purely a state law question about how California law gets applied. What California said since Reich versus Purcell in 1967 is that California engages in a governmental interest analysis. And part of that analysis is to see whether another state has an interest in having its law applied to the same transaction instead of California. And in doing so, the state court analyzes whether or not the other state has an interest in having its law applied to deny a remedy under that circumstance where California would allow a remedy. There is zero interest a non-repealer state would have in denying a remedy to its citizens under California law for harm caused to them by a California company. That seems like an overly broad statement. I mean, certainly there's some interest allowing commerce to occur and not deterring commerce in their states might be one. That's all, Your Honor, you're exactly right. But here's the point. Choice of law is a case-specific, issue-specific analysis. That's what the California Supreme Court said in Kearney. It's the law of California that you look to the issue in a case. You don't have some general rules that say place of wrong or place of injury count. You look to the interest involved in the state. Qualcomm wasn't doing business in those states. None of the activities of Qualcomm. But you could, I mean, other states could say, we want to encourage, you know, cell phone usage in our state and therefore we're not gonna, you know, we don't want remedies available here. I don't know that they've done that. I mean, you could argue whether they have by not repealing the Illinois brick rule. But I think it just, I was just struck by the breadth of your comment that no other state could potentially have an interest. That seems broad. Well, you have to apply choice of law to the facts of the case. Well, I am. And I think that other states do have an interest here. But what interest would they have that would be furthered by denying a remedy against Qualcomm? It's not denying a remedy against Qualcomm. It's applying their state law. They've made a policy decision to not repeal Illinois brick. They have, your honor, but not in all circumstances. Well, that may be, but isn't that the problem here? That everybody, all states have treated this differently. And now we have California coming in and saying we're going to rule the entire United States, literally. And that's a problem. You understand why those who don't live in California get a little bit frustrated with that kind of an approach. If another state, a non-repealing state, had an interest that would be furthered. It is furthered, that's their law. That's the law that they've adopted. Why they didn't want California coming in and telling them what their law is and making policy decisions for them. On that point, your honor, think about this, if you may. This is the critical point. Has any state, by failing to repeal Illinois brick and to say that indirect purchasers have no right to sue for damages based upon its laws, has any state announced a policy that says that its residents can't sue under the law of another state that would give them a remedy where the activity in question didn't take place in their state? I understand, that's your best argument. But you've overstated, I think you've overstated your case. I think what you just said now is your best argument. But I think I'm taking issue with some of your broader statements that they just don't possibly have any interest at all. And I don't think that's true. Let me see if I could refine the point. Well, I think you just did. Okay, but that really is the issue. That's what we argued in the court, that there was no interest that they would have in denying their residents a remedy where it wouldn't further their business interest. It wouldn't attract business. It would have no impact at all. Qualcomm has several layers. It would attract what's put into their states. If they say, we want to encourage, we want to encourage as many, as vibrant of a competition as possible. We want to encourage as many products to be sold here. And that's why we've adopted this rule. Then what you're advocating is against that. But you have to apply it to the facts of the case. That's the point. And Your Honor, if indirect purchasers in a non-repealer state were denied a remedy, what impact? They're not denied a remedy. They're denied a remedy that you see fit under California law. They have, this is the problem you got. I mean, you're saying stick to the facts. Well, stick to the facts. You're overstating your case. Stop it. Well, I apologize if that's how Your Honor perceives the argument. Because what I'm trying to make the point is that the point of a state in applying its law, you'd have to see whether or not applying it to the facts of the case would further its interest. How would saying that California law can't apply in favor of its residents encourage or discourage cell phones from being sold in those states? It'd have no impact whatsoever. Well, because Qualcomm, if that's true, then Qualcomm is being harmed. It's gonna reduce or there's gonna be impact on the competition on any willingness of companies to put out more product. I mean, I'm not saying it's true or not true. I'm just saying it's possible. And I think you keep coming back and saying, well, there's not a possible interest at all. And that's just on its face, doesn't seem like a persuasive argument. I think what you said before and what you got into is a little bit more persuasive. And I think that's what we've got to address. And let me very quickly address MAZA and why it's distinguishable here. MAZA is a case where Honda is alleged to have made the misrepresentations that issue itself. And through its dealers sold cars in various other states through its authorized dealers, where the misrepresentations that Honda itself made were ones the plaintiffs alleged they relied upon to their detriment in buying the cars. Honda, unlike Qualcomm, was doing business in those states. That was the context in which the court said that the district court didn't properly weigh the interests of the other states and decided whether their consumer protection laws should apply. That's a totally different situation here. The other thing I would point out, just because this is, again- Okay, go ahead. I'm sorry, this is a choice of law question. We cited authority for the proposition that post the restatement first of Congress, of conflicts of law, which had very rigid rules about deciding was place of purchase the absolute determinative factor to decide choice of law. That rule was abandoned by California in 67. Many other states have abandoned it. They followed the second restatement, which looks to the significant relationship of the parties. If you look at the law review study that's cited by the reporter of the third restatement of conflicts of law that's currently in work right now by the American Law Institute, they point out that 86% of the states in a tort case would give the plaintiff the option of choosing to sue under the law of his state or the law of the state where the conduct took place that caused the harm. It's not 100%. It's not 100%, but it's 86%. That's the problem. You're certifying the largest class action that we've ever seen, and you've got multiple states. What would be the problem here if we just sent this back and said, listen, we're willing to allow, or the Constitution allows certification of a class for all states who have repealed Illinois BRIC? Does it have to get more into it than that? Because I guess there's differences in, I mean, are there two options here, Illinois BRIC versus non-Illinois BRIC, or are there really like 10 options? Illinois BRIC and then nine variations of repeals of- Here's what's happened in other courts where you've had the application of California law to other repealer states. In the cases that were cited in district court level, the issue that they looked at was whether there's a conflict applying California's choice of law rules and the laws of non-repealer states. If there's no conflict under California choice of law rules, California law applies. That's what- And a conflict is not that, had this suit been brought in a non-repealer state, that there would be no cause of action. That's right. That's not a sufficient conflict to say, if you had to bring this suit in your own state, in your home state, you couldn't recover, but you can recover in California, and that doesn't present a conflict? Well, the cases have said that the conflict was said just because those states have said indirect purchasers can't pursue for damages, that's a material difference between California law. We admit that. That is a difference in California law. California law says indirect purchasers can sue. Then the question, which I've been arguing, is that those states who don't have repealer laws don't have an interest in having their laws applied to the facts of this case to deny their residents a remedy. But if there were to be a determination that they do have an interest, then you've got a true conflict. But with respect to the states that have not followed Illinois BRIC, there's no conflict. And therefore, there'd be no reason under California law not to apply California law to the residents of those states. Right, and that's my question, but I'm wondering if it's a binary choice or if it's really more segregated. Can we just say Illinois BRIC and non-Illinois BRIC, or are there a lot of variations here that we need to send this back and have a full 50-state analysis? The only argument that was made by Qualcomm, the only argument by the government, and they say take no opposition, it's simply Illinois BRIC versus non-Illinois BRIC. It's a binary choice in that regard. And the case of- And how many states is that? If we went Illinois BRIC versus non-Illinois BRIC? That's a very good question, Your Honor, because that would be a question I think that would be appropriate, if that's the rule that the court adopts in this case, to remand to Judge Koh to decide which states are repealer and which states are non-repealer. Qualcomm says there are 22 non-repealer states. The American Antitrust Institute in their amicus brief points out that the authorities show at most they're 12 or 13. So you'd have to pick out those states. And that's something Judge Koh could perfectly well do on remand, just following that bright line rule, which is the only rule that was argued by Qualcomm, a bright line rule in that regard, in this case. Okay, that's helpful. Can you get into some of the other issues? Because factually, obviously this is a complicated case to get into, and where does abuse of discretion apply or not? Do you agree that these are legal questions and that the question we're determining is whether a legal error was made or not made, or do you think that they're all fact-intensive? I think it's very, very fact-intensive. I'm not surprised you said that, but tell me why. In this case, the court had before it expert reports that totaled nearly 4,000 pages of analysis, including statistical modeling based upon data that was taken from every level of the chain of distribution, from the OEMs, from Qualcomm, from distributors, from carriers and retailers, examining transaction data involving millions of phones. The expert applied what's called a hedonic regression analysis, which has been approved by courts across the country, and it's used generally in the world. For example, the quality-adjusted prices that he determined based upon his modeling is the same kind of thing that the Bureau of Labor Statistics uses in computing the cost of living index. It's a very well-accepted technique. The data that he used was extremely extensive. It included transaction data at every level of the stage of distribution. The basic thrust of the case is that Qualcomm imposed ex ante, a super friend royalty, on all persons using the technology and anybody who bought a Qualcomm chip. It covered the entire universe of cell phones being manufactured in the United States. That's why the class is as broad as it is as a function of the facts of the case. You have this effective industry-wide tax being imposed upon all the phones, and now the only question that Qualcomm raises, the fact question, was it passed through to consumers? Qualcomm doesn't question the commonality of the evidence to show that there was this tax that was imposed that was super friend on all of the OEMs, and it got incorporated into the prices of their phones. Well, that's the question, isn't it? Did it get incorporated? I thought that was the question, was did it get incorporated into the prices of their phones or did it get passed through in other ways to the consumers? And that is the only question that's raised. Well, that's a pretty big question. Well, but the evidence shows that it was, and let me just cite... The evidence shows that... That it was passed through. In every case, it was passed through to the phone. Yes, the evidence shows statistically there were positive pass-through rates. This is my problem with your statements. You said every single case it was passed through, and now you're saying, well, statistically speaking, it was. This is the problem you get when you get into a case like this. You can't... I mean, with hundreds of manufacturers, how can you say that they all did it the same way? You can come up with a statistical model, I get that, but you can't say that that proves that it was always done through the price of the phone. You have to take it step-by-step through the chain. First of all, Qualcomm imposed royalty rates on every OEM. That's undisputed, and the evidence that it did so is proven by common evidence. There's common evidence from Mr. Leszczynski, not challenged by Qualcomm, that that royalty charge was an overcharge. It was higher than a FRAN royalty rate would have been. The evidence from Professor L. Haig of Harvard University is that they were able to charge that super FRAN rate by virtue of the restraints that are at issue in this case. This is all common evidence. I'm not disputing any of that. What I'm saying is, how did that carry through? You're talking about going through the chain. Okay, we started with three things that I think everybody seems to agree on, but then you get into very complicated questions of how 100 different businesses manage that surcharge. And the critical point to understand in this regard, Your Honor, is the model that he used measured the quality-adjusted price of the phones. Here's what the evidence shows. At the time a phone was being designed and costed out, and the price targets were being selected. That was done in consultation, not just with the OEMs, but they did it in consultation with the carriers that they were gonna be selling the phones to, and the retailers that they were gonna be selling the phones to, and they engaged in choices about what qualities to put into a phone to meet certain price and cost targets. The evidence shows that actually, they took out quality features of phones to meet those targets. They adjusted the quality-adjusted price of those phones in light of the Qualcomm royalty. Let me say- But who's they? You're talking about 100 different companies, right? No, they're- How many? The five or six? There are five major OEMs. That's all you're talking about. Okay, so you're not talking about the, yeah, you're right, because you're talking about the quality of the phones. So you're talking about five or six, and you're saying that they all got together and made the same decision? I can cite to the evidence, Your Honor. I'm just asking what you're arguing. Yes, yes. You're saying they all got together and all made the same decision on the quality calculations that they've made. They were each making, each OEM made their own choices, but they did so ex ante based upon the quality, based upon the royalty that Qualcomm was charging them. And the evidence shows that when they did that, they did that, for example, AT&T would be involved with an OEM saying, I want these features. Can you meet this price target? And what they would do is take explicitly into account the Qualcomm royalty and saying, this is a cost item. It's gonna cost us $15 a phone because of this royalty. What feature can we take out that costs less than $15? A battery, a camera. We can reduce the size of the pixels. So all of these decisions are being made simultaneously at each, affecting each phone that's being sold in the- But those decisions could have been, couldn't they have been different based on, I mean, you could have gone to a retailer and said, look, we don't wanna take out these capabilities. Let's try and recoup this on an increased monthly fee. At the end of the day, that's true. But what you have is a phone whose quality has been set at the time the manufacturing decisions are made. That's so critically important to understand the theory of the case. And that that quality adjusted prices then pass through the chain of distribution. Now, let me make two points in that regard. This is fact-based findings by the court. They statement that this is without any factual foundation is absolutely incorrect. Well, I agree with you. I mean, as I read it, the district court put in what, 35 pages or 40 pages of analysis, analyzing all these things. So we're gonna have to go back through perhaps and see whether the evidence is as much as Qualcomm says or lacking as much as Qualcomm says. There is substantial evidence supporting each of Judge Koh's findings. She made it a meticulous analysis of the evidence. And she took into account all of Qualcomm's arguments and she responded to all of Qualcomm's arguments and showed why the evidence supported a contrary position. But I wanna make one point that I think is absolutely crucial to the analysis. What is the real issue here when you're talking about predominancy? How will the proof be presented? This proof is gonna be common proof to the class. We stand or fall on common proof. Individual class members need not come forward and testify about why they bought a phone. No, I understand, but you raise, I mean, this raises pretty big questions. I get it that the courts have said, look, we can't require every plaintiff to come in and testify how they've been harmed. And that statistical analysis, apparently in certain circumstances is okay. But boy, that's a slippery slope when you're contrasting that to the due process clause. The question is whether the proof will be common. Here, the proof will be common. That's, it is, you're right, it is the question. And I'm not entirely sure that I agree with that. No, the evidence will be presented on a common basis. Yeah, but it'll be statistically speaking common. But statistical evidence is allowable. I understand. To prove common in fact. I understand. And it's, and court after court across the United States. But where's the limit of that? Where's the limit? If there's, I mean, is that what we're limited to? If it is looking and saying, does this statistical analysis take into account these three alleged errors that Qualcomm makes and that's the limit to what we're doing? Or can we look at this even more comprehensively and saying, look, there's a outer limit to statistical analysis. You can't do this on a $15 billion case affecting 240 million people. It's just that, that stretches the due process clause too far. The issue is whether or not, for class purposes, will the evidence be presented on a common basis. That's the issue. If the, if the. And you're saying it is on a common basis because it's the same statistical model that's gonna be used on all. And that model shows that there was an overcharge passed through to the consumers with respect to all of the phones. Yeah, but differently to, okay, well, we'll figure that out. And one last point, the focal point pricing was raised. The focal points are set as part of that process, of the design process, ex ante. In other words, the carriers are setting their prices in light of the features that they've ordered the manufacturers to make, which in turn are based upon the choices they make, which in turn are based upon Qualcomm's royalty. If the royalty weren't there, they could make different choices that would improve the quality of the phones. That's a critical point to understand in terms of this focal point argument. And on the free phone point, your honor, that the evidence shows that there were trade-offs made. Carriers, there's no free lunch. Carriers don't give a phone to somebody for nothing. They recoup it in the service charges, in the monthly contract fees. But that's sort of, I think that, I don't see that as something that helps you. Or maybe it does. Okay, because I would view that as difference in how the harm occurs. No, the harm is baked in at the time the phone that is being sold has got less features than it would have on a quality-adjusted basis. But those are different analyses per OEM. I mean, not every phone comes out with the same capabilities. And different pass-through rates were measured by the expert to take into account the different data. In other words, this is a data-driven study. Finally, my time is short. On the uninjured class member point, and the Apple people, the evidence shows we didn't say that they weren't injured. And the expert has said, I can compute how they were injured because Apple made its choices in light of the claim that was being made against us by Qualcomm. And in fact, the expert has, in his merits report, calculated the damages of these Apple purchasers. And one last point, if they were to win at trial and say that those post-September 2016 purchasers weren't harmed, they can be excised by a simple mechanical test. So there's no ASICALL problem. There's no rail freight problem. The easiest demarcation line can be drawn between them. So that's not a basis not to certify the class. I see my time is up. And let's, the court has any questions. Thank you, Mr. Seltzer. Thank you, Your Honor. Mr. Van Esk. Thank you. Tens of millions of class members purchased phones at focal point prices. And their only answer to that is, well, if the price didn't change, the quality would. Tens of millions of additional class members paid nothing. And their answer to that is, well, it was taken from them some other way. Those two statements alone show you this cannot be done commonly across 250 million class members. And it's really not that complicated. Judge Koh, when it comes to quality, at page 46 of her order, refers to this as a theory that Dr. Flam posits. She calls it a theory that he posits, that changes would have been made. But Dr. Flam admits he did no testing of changes in quality based on cost. He says at excerpt of record 306, I held phone characteristics constant in my analysis, and that allowed me to test a relationship between cost and price, not between cost and quality. There's no dispute about that, and they haven't raised it. Dr. Flam admitted in his deposition that as to focal point price purchasers, there wouldn't have been a change in price. And I didn't hear a word of rebuttal about that. That's an excerpt of record at page 303, 57, excuse me, footnote 210. His testimony is set forth very clearly and very plainly there. There's simply no question that there are tens of millions of people that purchase phones as to whom there is no showing of price impact. And it's not a group that you can just go out and say, here they are, here they are, here they are. You need to know what model they bought, when they bought it, what OEM made it, what channel it came through, what retailer sold it. And the trial court has provided absolutely no mechanism for Qualcomm to exercise its due process right to challenge the tens of millions of people were not impacted, and therefore there's no liability as to them. This class simply cannot stand. The Maza point, I think was well argued, the panel fully understands it, but Maza is sort of the tail wagging the dog here. The dog is a 250 million member class with 1.2 billion transactions with the flimsy analysis they presented to the district court, doesn't pass the smell test under Comcast or Walmart or Ellis. The trial court failed to apply a rigorous analysis. She failed to apply the standard to find persuasive evidence that this could actually be demonstrated across the entire class. And for that reason alone, the order should be reversed. And the court, given the district court instructions to apply Comcast, apply Walmart, find a reliable way, if there is one, to prove injury for whatever class they want to present. But this class certainly can't stand given the enormous problems that exist putting Maza aside. And I thank the panel for your indulgence. Thank you, Mr. Van Ness. We thank both counsel for the argument. Stromberg versus Qualcomm is ordered to submit it. And with that, the court has completed the oral argument calendar for the day and we are adjourned. All rise.
judges: Siler, Bybee, R. Nelson